918 A.2d 441

**DEPARTMENT OF HUMAN RESOURCES, Anne Arundel County Department of Social Services**

v.

**Sherri HOWARD.**

**No. 53, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 13, 2007.

Sandra Barnes, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on brief), for petitioner.

Neal M. Janey, Jr. (Janey & Dixon, P.C., Catonsville, Ilona McClintick, Baltimore, all on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

This case presents an opportunity to consider an infrequently occurring phenomenon of appellate practice in Maryland. That phenomenon is the in banc proceeding. We focus here on the extent to which, when the Court of Special Appeals hears and decides an appeal in banc with a full complement of the thirteen incumbent members of the Court, specially assigned retired judges properly may sit also on the in banc court. With all respect to our retired appellate colleagues, who supply invaluable legal experience and erudition in support of the mission of the intermediate appellate court, we conclude that such a scenario is contrary to the statutory authority governing the composition and conduct of the Court of Special Appeals sitting in banc.

## I. FACTS

The underlying facts of this case, except insofar as they supply context for the largely procedural, but dispositive, issue we shall decide here, are not germane. Consequently, we

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

recite a truncated version of the factual background, emphasizing rather the procedural history of this matter.

The Anne Arundel County Department of Social Services ("the Department") found Sherri Howard responsible for "indicated child abuse"[1] of her minor son, Alexander. Howard appealed administratively that determination, receiving a hearing before an Administrative Law Judge ("ALJ") of the Maryland Office of Administrative Hearings. The ALJ issued a written decision affirming the Department's finding that Howard perpetrated the physical variety of "indicated child abuse" by striking her son in the region of his eye, exposing him to a substantial risk of serious eye injury. Howard sought judicial review of the ALJ's decision, the final administrative adjudication of the matter, by the Circuit Court for Anne Arundel County. The Circuit Court reversed the administrative decision, opining that no reasonable administrative agency fact finder could have found Howard's act to have harmed or caused a substantial risk of harm to the well-being of her son. The court concluded that Howard did not intend actually to harm her child, thus removing her act from the scope of conduct considered to be abuse.

The Department noted a timely appeal to the Court of Special Appeals. The case was assigned routinely to a three-judge panel.[2] Before the panel decided the appeal (but after initial briefing[3] and oral argument before the three judge

---

1. "Indicated child abuse" essentially means a credible and unsatisfactorily refuted case of physical, mental, or sexual treatment of a person under the age of 18 that has harmed or presents a substantial risk of harm to the person's health or welfare. Md.Code (1999, 2004 Repl. Vol.), Fam. Law Article, § 5–701(b), (e), (m); *see also* COMAR 07.02.07.12.A.

2. The three-judge panel was composed of Chief Judge Joseph F. Murphy, Jr., Judge Arrie W. Davis, incumbent members of the court, and Judge Charles E. Moylan, Jr., specially assigned to the panel as a retired judge of the court.

3. The Department, as appellant in the Court of Special Appeals, framed the following question: "Did substantial evidence support the ALJ's findings that Ms. Howard struck her son in the eye, leaving a two-inch

panel), the intermediate appellate court invited the parties to submit additional briefs and argue the single question anew before the court in banc. Participating on the in banc court were the 13 incumbent members of the court and two retired judges who were specially assigned.[4] On 18 May 2006, the Court of Special Appeals, by an eight-to-seven vote, affirmed the judgment of the Circuit Court. Chief Judge Murphy authored the opinion for the eight-member majority, reasoning that Howard neither acted with an intent to, nor the knowledge that her act would, cause injury. *Dep't of Human Res. v. Howard*, 168 Md.App. 621, 644–45, 897 A.2d 904, 917–18 (2006). Judge Davis penned a concurring opinion, in which four other judges in the majority joined, including Judge Thieme, espousing the view that the ALJ's decision should have been reversed solely on the basis that Howard did not intend deliberately to harm Alexander nor did she act in reckless disregard of the possibility of harm. *Howard*, 168 Md.App. at 652, 897 A.2d at 922.

There were two intertwined camps of dissenting judges. One dissent, authored by Judge Moylan and joined by six incumbent judges, took issue with the majority's perceived lack of fealty to the principles of judicial deference to certain administrative agency determinations and reasoned that, under the substantial deference standard, the court should not have disturbed the ALJ's factual findings and resultant legal conclusion. *Howard*, 168 Md.App. at 663–72, 897 A.2d at 928–

---

bruise, and that this incident constituted 'indicated child abuse?'" Howard, as appellee, presented the question thusly: "Did the Administrative Law Judge err when finding, as a matter of law, that the department had correctly identified Ms. Howard as a child abuser?"

4. The in banc court was composed of Chief Judge Murphy, and Judges Davis, Hollander, Salmon, James R. Eyler, Deborah S. Eyler, Kenney, Adkins, Krauser, Barbera, Sharer, Meredith, and Woodward. This is the line-up, if you will, of the full complement of the current 13 incumbent members of the court. Two retired, specially assigned judges also sat with the court in banc and participated in deciding the appeal: Judge Moylan, a member of the initial three-judge panel to consider the case, and Judge Raymond J. Thieme, Jr. As best as we can discern from the record, Judge Thieme, until assignment to the in banc panel, had no prior connection to the processing of the appeal.

33. Judge Moylan also explicated that relevant precedent made it clear that Howard's swing of the hand with the intention to make contact with her son was all that was necessary to support a finding of abuse when harm results; an intent to create harm by swinging at the child was not required. *Howard,* 168 Md.App. at 678–79, 897 A.2d at 937. Four of the dissenting incumbent judges, with Judge Deborah Eyler writing, echoed Judge Moylan's sentiments generally, but emphasized, as especially problematic in upsetting the ALJ's decision, the unrestrained and unannounced nature of Howard's discipline. *Howard,* 168 Md.App. at 681, 897 A.2d at 938.

The Department petitioned this Court for a writ of certiorari on the question of the proper standard for administrative determinations of indicated child abuse.[5] In our Order granting certiorari and issuing the writ, we posed a further question: "What authority does the Court of Special Appeals have to hold an *en banc*[6] hearing with fifteen judges?" This additional question of appellate procedure becomes a threshold question because the proper constitution of the intermediate appellate court sitting in banc is a prerequisite for a valid decision for us to review. If no valid judgment was rendered by the Court of Special Appeals, we may not review the judgment of the Circuit Court (and thus the ALJ's decision) because the writ of certiorari was issued not to the Circuit Court, but rather to the Court of Special Appeals. Thus, even though we ordinarily would stand, analytically, in the shoes of the Circuit Court in reviewing the decision of the ALJ, *Spencer v. Md. State Bd. of Pharmacy,* 380 Md. 515, 523–24,

---

**5.** The Department presented in its petition the following question for review: "When a parent deliberately strikes a child, and injury results, should the parent be exempted from a finding of 'child abuse' on the basis that the injury was 'accidental or unintentional' unless the local department establishes that the parent intended the injury or acted with reckless disregard to injury?" Because of our decision as to the impropriety of the in banc court's composition, we shall not reach the merits of the Department's question.

**6.** For an explanation of the varying spelling of this phrase, see *infra* n. 7.

846 A.2d 341, 346 (2004); *Gigeous v. Eastern Correctional Institution*, 363 Md. 481, 495–96, 769 A.2d 912, 921 (2001), we cannot simply side-step the question of whether the Court of Special Appeals's judgment, a procedure point of departure for our review, was issued by a properly constituted in banc court.

## II. DISCUSSION

At the outset, we note that the statute addressing in banc [7] proceedings in the Court of Special Appeals is unadorned with decisional law interpreting its meaning regarding the question

---

7. The term "in banc" appears not to be defined in the Maryland Code or Constitution. The meaning traditionally bestowed upon that phrase, however, indicates that it is a reference to the full complement of a given court. *See, e.g.*, BLACK'S LAW DICTIONARY 546 (7th ed. 1999) ("With all the judges present and participating; in full court"); BALLENTINE'S LAW DICTIONARY 400, 506 (3d ed.1969) (defining "en banc" as "on the bench" and cross-referencing to "full bench," which is defined as "the court with all the qualified judges sitting in a case, particularly an appellate court"); JOHN BOUVIER, 1 LAW DICTIONARY AND CONCISE ENCYCLOPEDIA 318 (1914); STEWART RAPALJE & ROBERT L. LAWRENCE, 1 DICTIONARY OF AMERICAN AND ENGLISHLAW 108 (1888); Alternate spellings include "en banc," "in bank," and "in banco." BLACK'S, *supra* at 546. The drafters of the Maryland Constitution, as well as successive General Assemblies, spelled the phrase "in banc," *see, e.g.*, MD. CONST. art. IV, § 22, which appears to be a corruption of the French "en banc" and the Latin "in banc o." PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY 480 (3d ed.2003); *see generally* John J. Connolly, Comment, *Maryland's Right of In Banc Review*, 51 MD. L.REV. 434, 434 n. 3 (1992) (discussing the "local peculiarity" of the "in banc" spelling). Notably, the federal statute governing in banc procedure shares Maryland's spelling of "in banc." 28 U.S.C. § 46 (2000).

In banc proceedings in common law England, whence our practice evolved, were of a different species than their current form in the United States. Historically, the *Curia Regis*, the highest judicial body in the land on which the monarch himself sat, entertained only the most pressing matters brought by those in the highest echelons of society. Ralph V. Turner, *The Origins of Common Pleas and King's Bench*, 21 AM. J. LEGAL HIST. 238, 239 (1977). Over time, the *Curia Regis* steadily was divided into three specialized, superior common law courts, including the Court of Common Pleas, or *Bancus*, which heard civil matters between private subjects at Westminster. WILLIAM BLACKSTONE, 4 COMMENTARIES *39–40. Before the Court of Common Pleas was established permanently at Westminster, the full bench traveled to individual counties to hear cases, which were tried before the full bench with juries

of appellate procedure before us. Section 1–403(c) of the Courts and Judicial Proceedings Article of the Maryland Code (1974, 2006 Repl.Vol.) (hereinafter "Cts. & Jud. Proc.") is the primary authority governing the intermediate appellate court's procedure for hearing and deciding cases in banc. Thus, our analysis of the statute will begin, when it begins, with its plain language. Initially, however, a review of the Court of Special Appeals's genesis and evolution seems in order as context for our inquiry.

composed of twelve law-abiding men of that county. John William Smith, an Elementary View of the Proceedings in an Action at Law 61 (1848). When the Court settled in Westminster, the trial procedure from when the court was itinerant remained in effect, requiring jurors, witnesses, and parties to sojourn from the county from which the action arose. Parliament solved this inconvenience by providing that certain justices who traveled to localities trying actions in land, or *assizes*, may be substituted for the full Court in banc at Westminster to decide other, uncomplicated civil matters. *Id.*; William Forsyth, History of Trial by Jury 139 (2d ed. 1875). This was accomplished by what later became known as the Statute of Nisi Prius, which ordered the sheriff of a county to bring jurors to the Court at Westminster on a certain day *nisi prius* (unless before) that day the justices of *assize* arrived in the county, at which point the justices of *assize* would hear the matter and obviate the need for all concerned to travel to Westminster. Smith, *supra* at 61; Forsyth, *supra* at 140. Typically, a judge sitting *nisi prius* would not advance beyond the verdict stage and would reserve matters of legal error such as the improper admission or exclusion of evidence, incorrect jury instructions, and misconduct on the part of a juror or counsel, to be resolved by the full Court of Common Pleas sitting in banc at Westminster. Alison Reppy, Introduction to Civil Procedure 10 (1954); Arthur Engelmann, a History of Continental Civil Procedure 67–68 (1927). Although this system reverted ultimately to the earlier procedure, Smith, *supra* at 62; Forsyth, *supra* at 140, it nonetheless remains the origin of the surviving distinction between a single judge sitting *nisi prius* to determine factual issues before a jury and the full membership of the Court sitting in banc to determine solely legal questions.

This practice of mediacy, which severed the fact-finding and law-applying stages of deciding cases, Reppy, *supra* at 45–46; Engelmann, *supra* at 67–68, is not reflected in modern American appellate practice. Indeed, our adaptation of the in banc procedure is more akin to the later English practice under the Judicature Acts, resorting to an in banc sitting of a given court as an appellate body to review both the findings of fact and conclusions of law reached by one court in a single sitting. Engelmann, *supra* at 68. Nevertheless, the principle of in banc sittings being utilized to review the legal accuracy and propriety of a decision of a smaller panel of the same court remains intact in modern American, and Maryland, jurisprudence.

Creation of the Court of Special Appeals was authorized by a constitutional amendment approved by the General Assembly on 23 March 1966 and ratified by the electorate on 8 November 1966 as Article IV, § 14A of the Maryland Constitution, which bestowed on the Legislature the power to "create such intermediate courts of appeal, as may be necessary" by statute and prescribe their jurisdiction and powers. Chapter 10, § 1 of the Acts of 1966. Pursuant to that constitutional amendment, the General Assembly created, by statute, the Court of Special Appeals as the second ever [8] intermediate appellate court in Maryland. Chapter 11, § 1 of the Acts of 1966 (codified at Md.Code (1957, 1966 Repl.Vol.), Art. 26, § 130 and recodified at Cts. & Jud. Proc. Article, § 1–401). At the time of its nativity, the intermediate appellate court's jurisdiction was limited to criminal matters involving sentences other than death.[9] Md.Code (1957, 1966 Repl.Vol.), Art. 26, § 130. The court was composed of only five members, hearing and deciding cases as a full court at that time. *Id.* Four years later, however, the General Assembly expanded the Court of Special Appeals's jurisdiction to include certain civil matters, concomitantly increasing its size to nine members hearing cases in panels of no less than three judges. Chapter 99, § 1 of the Acts of 1970. Along with the expansion, the Legislature empowered the court to hear and decide cases in banc by a majority vote of the judges of the court. *Id.* Within the ensuing seven years, the size of the intermediate appellate court was expanded on three more occasions: to

---

**8.** During the Revolutionary War period, the newly-declared independent State of Maryland provided in its Constitution for an intermediate appellate court named the General Court. MD. CONST. of 1776, art. LVI. The court was bifurcated into two branches: one each for the eastern and western shores of the Chesapeake Bay. The General Court was abolished in 1806, leaving the Court of Appeals as the State's only appellate court until the Court of Special Appeals was formed 160 years later. Chapter 55 of the Acts of 1804.

**9.** The original purpose for the creation of the Court of Special Appeals was to "relieve [the Court of Appeals] of the substantial increase of criminal appeals which had inundated the Court and yet provide at least one appeal as of right. . . ." *Walston v. Sun Cab Co.,* 267 Md. 559, 565, 298 A.2d 391, 395 (1973). Our gratitude endures to this time.

10 judges in 1973,[10] 12 judges in 1974,[11] and to the now familiar number of 13 judges in 1977.[12]

Today, the Court of Special Appeals "consists of 13 judges" and, with few exceptions, "has exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or other action of a circuit court, and an orphans' court." Cts. & Jud. Proc., §§ 1–402(a), 12–308. In the course of ordinary procedure, the court hears and decides cases in panels of no less than three judges.[13] Cts. & Jud. Proc., § 1–403(b). "A hearing or rehearing before the court in banc may be ordered in any case by a majority of the incumbent judges of the court" and "[t]he concurrence of a majority of the incumbent judges of the entire court is necessary for decision of a case heard or reheard by the court in banc." Cts. & Jud. Proc., § 1–403(c). In the present case, we must decide whether the statutory reference to "incumbent judges" proscribes the participation of retired judges in hearing and deciding cases argued in banc. We hold that it does.

 It is well-settled that "the cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the legislature," *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006); *Melton v. State*, 379 Md. 471, 476, 842 A.2d 743, 746 (2004) (quoting *Holbrook v. State*, 364 Md. 354, 364, 772 A.2d 1240, 1245–46 (2001)), which is accomplished by first looking "to the language of the statute, giving it its natural and ordinary meaning." *Dep't of Assessments &*

---

10. Chapter 2, § 1 of the Acts of 1973, 1st Spec. Sess.

11. Chapter 706 of the Acts of 1974

12. Chapter 252 of the Acts of 1977.

13. The statute governing the hearing of cases in three-judge panels was amended in 1983 to remove the requirement that the Court of Special Appeals *decide* cases by a panel of three judges. Chapter 6 of the Acts of 1983. This amendment allows the court the flexibility to hear cases in three-judge panels and still render a two judge majority decision in the event that one member of the panel is unable to participate in the decision-making phase of the case.

*Taxation v. Md.-Nat'l Capital Park & Planning Comm'n,* 348 Md. 2, 13, 702 A.2d 690, 696 (1997); *see Chow v. State,* 393 Md. 431, 443, 903 A.2d 388, 395 (2006) ("Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.") (citing *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484, 487 (2004)). Further, the language of a statute must be viewed as a whole, with reference to the surrounding provisions of the statute. *Bd. of Physician Quality Assurance v. Mullan,* 381 Md. 157, 168–69, 848 A.2d 642, 649 (2004); *Md. Green Party v. Md. Bd. of Elections,* 377 Md. 127, 178–79, 832 A.2d 214, 244 (2003); *Bd. of County Comm'rs v. Bell Atl.-Md., Inc.,* 346 Md. 160, 178, 695 A.2d 171, 180 (1997). This harmonizing process also must be observed with respect to an overarching statutory scheme implicating multiple statutes. *Mayor & Town Council of Oakland,* 392 Md. at 316–17, 896 A.2d at 1045; *Mid–Atl. Power Supply Ass'n v. Pub. Serv. Comm'n,* 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000).

██ We think it evident that, in the context of the statute discussing the conduct of proceedings in the Court of Special Appeals, a reference to the "incumbent judges of the court" embraces only those judges appointed by the Governor, subject to a plebiscite election to retain a seat on the court for a ten year term.[14] This conclusion is supported by the common conception of the term "incumbent," which ordinarily means one who holds an active and ongoing office of public trust. Thus, with reference to Cts. & Jud. Proc., § 1–403(c), the 13 judges so appointed constitute the Court of Special Appeals

---

14. Judges of the Court of Special Appeals, like those of the Court of Appeals, initially attain that office, upon a vacancy on the court, by appointment of the Governor and the advice and consent of the Senate. MD. CONST. art. IV, § 5A(b). An appointed judge is then submitted to the electorate for "rejection or approval by the registered voters of the geographical area prescribed by law at the next general election following the expiration of one year from the date of the occurrence of the vacancy which he was appointed to fill. . . ." *Id.* § 5A(d). An appellate judge remains subject to such retention elections every ten years. *Id.* § 5A(d), (e).

are its "incumbent judges." This is in contradistinction to specially assigned judges, whether retired or active members of other courts, who may sit with three-judge panels of the court only by special assignment.[15] The critical modifier "incumbent" is conspicuous by its absence in the subsection discussing the court when sitting as standard three-judge panels. Cts. & Jud. Proc., § 1–403(b). There exists in that subsection no requirement that a three-judge panel decision be reached only by a majority of incumbent judges of the court, thus permitting specially assigned judges to partake in the hearing and decision of cases conducted before such a panel. Indeed, such a requirement, if read into the statute, would frustrate the purpose and utility of the special assignment tool to provide substitutes for absent incumbent judges or alleviate an accumulation of cases in the discharge of the court's everyday caseload. As will be discussed, *infra*, however, the participation of specially assigned judges in the in banc process is incompatible with the policy underlying in banc proceedings, which are the exception to the court's ordinary method for the consideration and decision of cases.

While the unambiguous and clear language of the statute convinces us of the propriety of our conclusion, we are not precluded from consulting extrinsic sources, such as legislative history, to confirm the accuracy of our divination of legislative intent. *Stanley v. State*, 390 Md. 175, 185, 887 A.2d 1078, 1084

---

**15.** Former judges with the requisite experience and qualifications who consent to serve on temporary assignment by the Chief Judge of the Court of Appeals first must be approved by the administrative judge of the circuit in which the former judge is to be assigned and then approved by a majority of the judges of the Court of Appeals. Md.Code (1974, 2006 Repl.Vol.), Cts. & Jud. Proc. Article, § 1–302(b) (hereinafter "Cts. & Jud. Proc."). Having secured the requisite approvals, a former judge then may be recalled and assigned to a particular court, or courts, and cases as needed. Although not implicated in this case, the Maryland Constitution also authorizes currently sitting, incumbent judges to be assigned temporarily. "The Chief Judge of the Court of Appeals may, in case of a vacancy, or of the illness, disqualification or other absence of a judge or for the purpose of relieving an accumulation of business in any court, assign any judge except a judge of the Orphans' Court to sit temporarily in any court except an Orphans' Court." Md. Const. art. IV, § 18(b)(2); *see* Md. Rule 16–103.

(2005) (citing *Design Kitchen & Baths v. Lagos,* 388 Md. 718, 730, 882 A.2d 817, 824 (2005); *State v. Glass,* 386 Md. 401, 411, 872 A.2d 729, 735 (2005); and *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000)); *Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 29, 766 A.2d 1036, 1042–43 (2001); *Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990); *Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977). Although acknowledging the usual paucity of archival legislative history relating to most statutes enacted in Maryland before the mid–1970s, and particularly so here with the 1970 law expanding the Court of Special Appeals and empowering it to sit in banc, a subsequent Code revision in 1973 yields a legislative artifact that sheds light on the meaning of § 1–403(c).

Specifically, we refer to a report of the Governor's Commission to Revise the Annotated Code ("the Commission") addressed to the General Assembly on the matter of the revision of the Courts and Judicial Proceedings Article. This report, although discussing largely the non-substantive changes to the Article, noted certain substantive changes, including a revision of some key language regarding the in banc procedure of the Court of Special Appeals effected in the predecessor statute to § 1–403:

> In § 1–403(c), a clarification is attempted with respect to in banc hearings. Art. 26, § 130 provides that the "majority" of the entire court is necessary for a decision in such a case. It is not clear whether this means a majority of the full number of authorized judges or *the judges actually in the office where [sic] the hearing is held.* The commission has inserted the latter interpretation in § 1–403(c) as a matter of practical administrative convenience. It provides that a hearing or rehearing before the court in banc may be ordered in any case by a majority of the *incumbent judges of the court.* Six judges of the court constitute a quorum of the court in banc and the concurrence of the majority of the incumbent judges of the entire court is necessary for decision of a case heard or reheard by the court in banc.

GOVERNOR'S COMM'N TO REVISE THE ANNOTATED CODE, ANNOTATED CODE COMM'N, COMMISSION REPORT NO. 3F TO THE GENERAL ASSEMBLY OF MARYLAND 15 (1973) (emphasis added). The notation by the Commission explicitly states that the reference to "incumbent judges" in § 1–403(c) is to those judges "actually in [ ] office [when] the hearing is held." This understanding of the "incumbent judges" of the Court of Special Appeals, later folded into a Revisor's Note on § 1–403(c),[16] necessarily excludes specially assigned judges because those judges are not officeholders of the court in the strict sense.

As explained *supra,* one initially achieves office as a judge of the Court of Special Appeals only by appointment of the Governor and the advice and consent of the Senate. *See supra,* at 11 n. 14. When judges who fulfill these qualifications, such as the Hon. Charles E. Moylan, Jr. and Hon. Raymond J. Thieme, Jr., retire, they vacate office. MD. CONST. art. IV, § 5A(a). The Maryland Constitution, for better or for worse, also prohibits a judge from holding office as an incumbent after the attainment of his or her 70th birthday. MD. CONST. art. IV, § 18B(b), (c) ("[I]n no event shall any judge continue in office after his seventieth birthday."). Without betraying the ages of the retired judges involved here, it suffices to state that they are barred by Article IV, §§ 5A(a)

---

**16.** The Revisor's Note indicated that, as a result of the revision's clarification that a majority of the Court of Special Appeals sitting in banc may be had from the seats actually filled, rather than the full number of authorized judges, Cts. & Jud. Proc., § 1–403(c) "provid[es] for readier action by the court in banc if there are vacancies." We have viewed Revisor's Notes as helpful, though not infallible, aids to statutory construction by revealing possible legislative intent. *Compare Comptroller of Treasury v. Blanton,* 390 Md. 528, 538, 890 A.2d 279, 285 (2006) (indicating that legislative intent may be derived from Revisors' Notes to inform statutory construction), *with Stanley v. State,* 390 Md. 175, 186, 887 A.2d 1078, 1084 (2005) (stating that a Revisor's Note cannot override the plain language of a statute). This newly-gained readiness obviates the need to specially assign judges to fill vacant seats for the court to hear and decide cases in banc. Before the revision, if seven judges of the 13 member court were absent, the court could not have acted in banc for lack of a majority unless judges were specially assigned to fill temporarily the vacant seats, the post-revision interpretation allows a four-member majority of the 6 filled seats to decide a case in banc.

and 18B(b) from holding judicial "office." This is, of course, no commentary on the inherent wisdom or faculties of our retired brethren to serve the public. Indeed, the public and the Judiciary are indebted to those retired judges who render continuing service in the discharge of the business of the courts, consonant with the devotion and careful attention of the incumbent judges in active service. The abundance of experience brought to bear by retired judges is an invaluable commodity in the administration of justice in this State and is not taken for granted. We are bound, nonetheless, to interpret and effectuate the statute as we are given the light to see what was intended by the Legislature. *See Homes Oil Co., Inc. v. Dep't of Env't,* 135 Md.App. 442, 467, 762 A.2d 1012, 1025 (2000) (Thieme, J.); *Wright v. Sue & Charles, Inc.,* 131 Md.App. 466, 468–69, 749 A.2d 241, 241–42 (2000) (Moylan, J.); *Warner v. Lerner,* 115 Md.App. 428, 441, 693 A.2d 394, 400 (1997) (Thieme, J.) ("We are duty bound to interpret an unambiguous law as it is written-even if the result is not what our conscience tells us it should be."); *People's Counsel v. Beachwood I Ltd. P'ship,* 107 Md.App. 627, 647–48, 670 A.2d 484, 494 (1995) (Moylan, J.).

The Department in the present case, although challenging the merits of the majority opinions of the in banc Court of Special Appeals, nonetheless defends the composition of the in banc court in this matter. It asserts that the investment of "all the power and authority" of a judge of the court on which a specially assigned judge may sit accords that judge the corresponding "office," even if for a temporary period. Cts. & Jud. Proc., § 1–302(e); *cf.* Md. Const. art. IV, § 18(b)(5). This view is incorrect. The language relied on by the Department merely conveys impermanently the power and authority of the "office," not the actual "office" itself. No appellate judge may attain "office" other than by appointment. Md. Const. art. IV, § 5A(b) ("Upon the occurrence of a vacancy the Governor shall *appoint,* by and with the advice and consent of the Senate, a person duly qualified to fill said office....") (emphasis added); *see* Cts. & Jud. Proc., § 1–402(b) (requiring that judges of the Court of Special Appeals

be "selected, *appointed,* [and] retained" in accord with Article IV of the Maryland Constitution) (emphasis added). The constitutional provision and statute governing the sitting of retired judges, as well as the constitutional provision addressing the sitting of judges from other courts, both speak in terms of a temporary *assignment* rather than a temporary *appointment.* MD. CONST. art. IV, § 3A(a)(1) (permitting any former judge to be *"assigned* by the Chief Judge of the Court of Appeals, upon the approval of the majority of the court, to sit temporarily....") (emphasis added); Cts. & Jud. Proc., § 1–302(b) (same); MD. CONST. art. IV, § 18(b)(2) (permitting the Chief Judge of the Court of Appeals to "assign any judge ... to sit temporarily....") (emphasis added).

More importantly, if the Department's interpretation were to prevail, the special assignment of judges routinely would expand the size of the Court of Special Appeals beyond its statutorily-prescribed maximum complement of 13 judges, when no vacancies exist. This is because absent judges do not forfeit their office, even temporarily. Judges generally abdicate their office only in certain, limited circumstances such as: death, resignation, removal, retirement, disqualification by reason of age or change in domicile inconsistent with legal requirements, or rejection by the voters. MD. CONST. art. IV, § 5A(a).[17] Thus, under the Department's theory, when a judge is assigned specially to sit with the full court in banc, the court technically would consist of 14 judges, in contravention of Cts. & Jud. Proc., § 1–402(a).

Our conclusion that specially assigned judges are not incumbents of the Court of Special Appeals does not end our inquiry. We consider whether Cts. & Jud. Proc., § 1–403(c) explicitly disqualifies non-incumbents from participation in the hearing and decision of cases considered in banc. The statute

---

17. The pragmatic infeasibility of the Department's theory is exhibited further by the fact that if a judge who was absent or was compelled to recuse him or herself were deprived temporarily of office as a result, then he or she would be required to endure the entire appointment process anew to regain his or her judicial office. MD. CONST. art. IV, § 5A(a).

iterates that a majority of incumbent judges are necessary to order the hearing of and render a decision in a case to be considered in banc. The language does not make allowance for other persons to participate in banc and, in our view, need not list exhaustively each person or class of persons not eligible to participate. *See Moody v. Albemarle Paper Co.,* 417 U.S. 622, 624, 626, 94 S.Ct. 2513, 2515, 2516, 41 L.Ed.2d 358 (1974) (per curiam) (holding that the federal statute permitting the decision to order an in banc hearing be made by "a majority of the circuit judges of the circuit who are in active service," excludes retired judges from participation).

It makes little sense to permit the participation of judges in the hearing and decision of a case for which, according to the statute, their vote may not count. The policy rationale for holding in banc proceedings is to empower incumbent judges to control the jurisprudence of the court on which they sit. Alan M. Wilner & Joseph F. Murphy, Jr., *Inner Workings of the Court of Special Appeals of Maryland, in* APPELLATE PRACTICE FOR THE MARYLAND LAWYER 50–51 (Paul Mark Sandler & Andrew D. Levy, eds., 2d ed. 2001) ("In the very infrequent situation where a majority of the full court is unwilling to approve an opinion to which a majority of the panel is committed, the chief judge will direct that the case be reargued *en banc,* which means before at least seven judges. *Again, the reason for this is to prevent a minority of the court from adopting precedent for the majority.*") (emphasis added); *see United States v. Am.-Foreign S.S. Corp.,* 363 U.S. 685, 689, 80 S.Ct. 1336, 1339, 4 L.Ed.2d 1491 (1960) ("[En banc courts] are convened only when extraordinary circumstances exist that call for authoritative consideration and decision by those charged with the administration and development of the law of the circuit."); *Am.-Foreign S.S. Corp.,* 363 U.S. at 689–90, 80 S.Ct. at 1339 (" 'The principal utility of determinations by the courts of appeals in banc is to enable the court to maintain its integrity as an institution by making it possible for a majority of its judges always to control and thereby to secure uniformity and continuity in its decisions....' ") (quoting Albert Branson Maris, *Hearing and Rehearing* Cases in Banc, 14

F.R.D. 91, 96 (1954)); Pamela Ann Rymer, *The "Limited" En Banc: Half Full, or Half Empty?*, 48 ARIZ. L.REV. 317, 320 (2006) ("The full bench can always change the outcome or the rationale of a panel opinion that a majority of the full court regards as out of line."); Martha Dragich Pearson, Citation of Unpublished Opinions as Precedent, 55 HASTINGS L.J. 1235, 1272 (2004) ("The en banc power is the only statutory mechanism allowing the full court to control the law of the circuit."); Note, *The Politics of En Banc Review*, 102 HARV. L. REV. 864, 876 n. 61 (1989); ROBERT J. MARTINEAU, MODERN APPELLATE PRACTICE § 15.3, at 250 (1983) (stating, with respect to the federal circuit courts of appeal, that "[i]n banc rehearing gives the active circuit judges the ability to control the law of the circuit"); *see also* ROBERT L. STERN, APPELLATE PRACTICE IN THE UNITED STATES § 16.6, at 460 (2d ed. 1989) ("Perhaps the most likely to be successful . . . is a request [for rehearing in banc] when there has been a dissent, and there is good reason to believe that a majority of the full bench will agree with it."). Inviting specially assigned judges, who are not incumbent members of the Court of Special Appeals, to participate in cases heard in banc runs counter to the notion that in banc hearings are intended to permit the incumbent membership of the court to control its precedent.[18] Again, this does not speak to the abilities of those judges specially assigned to sit on normal three-judge panels of the court, but merely reflects the widely-held policy undergirding the practice of in banc review.[19]

---

**18.** It is noteworthy in the present case that, subtracting Judge Thieme from the court majority and Judge Moylan from the dissenters would yield, in all likelihood, no change in the result as there would remain seven incumbents in support of affirmance of the Circuit Court's judgment and six inclined to dissent. Whether this supposition will prove accurate on remand remains to be seen. We cannot resolve that question here by such judicial checkbook balancing because the dynamics of conferencing and deciding a case is sometimes a delicate process influenced by the presence or absence of certain judges.

**19.** Our rationale for the exclusion of retired judges from in banc proceedings in the Court of Special Appeals holds no implication for the conduct of the Court of Appeals. There is no statutory directive

Although the rationale for implementing in banc review is in accord with that of the federal system, the details of in banc procedure in the Court of Special Appeals differs significantly from the federal appellate procedure. Maryland law approaches the participation of retired judges in banc in a manner altogether different from the federal system. Federal law permits senior judges [20] to participate in banc in cases for which they sat on an appellate panel. 28 U.S.C. § 46(c) (2000); *Igartua de la Rosa v. United States,* 407 F.3d 30, 31–32 (1st Cir.2005); *Baker v. Pataki,* 85 F.3d 919, 920–21 & n. 1 (2d Cir.1996). This is because the statute governing in banc proceedings in federal circuit courts of appeal specifically provides for the participation of senior judges. 28 U.S.C. § 46(c) ("A court in banc shall consist of all circuit judges in regular active service, . . . except that any senior circuit judge of the circuit shall be eligible (1) to participate, at his election and upon designation and assignment . . . as a member of an in banc court reviewing a decision of a panel of which such judge was a member. . . ."). Contributing to this practice, no

---

controlling the participation of retired judges in the hearing and decision of cases before the Court of Appeals, which traditionally sits in banc on all of its cases, as there is for the intermediate appellate tribunal. Rather, Article IV, § 14 of the Maryland Constitution requires only that the Court of Appeals have a quorum of five judges and states that, at its direction, the Court may sit "an additional judge or judges . . . for any case." In contrast to the requirement imposed by Cts. & Jud. Proc., § 1–403(c) that the Court of Special Appeals decide cases heard in banc by a majority of *incumbent* judges, the Court of Appeals need only have "[t]he concurrence of a majority of those sitting" to render a decision. Md. Const. art. IV, § 14. The mandate requiring cases to be decided by incumbent judges is absent from the language setting forth the procedures governing the Court of Appeals.

As we noted previously, retired judges may be assigned specially to sit on any court of this State, including the Court of Appeals. Md. Const. art. IV, § 3A(a)(1); Cts. & Jud. Proc., § 1–302(b). Thus, the participation of now-retired Judge Alan M. Wilner in this opinion does not raise the same concerns evoked by the in banc procedure of the Court of Special Appeals we review here.

**20.** Senior judges are retired from "regular active service" but retain their judicial office, 28 U.S.C. § 371(b)(1) (2000), and "may continue to perform such judicial duties as [they are] willing and able to undertake, when designated and assigned. . . ." 28 U.S.C. § 294(b).

doubt, is the fact that a federal judge electing senior status remains an Article III judge of his or her court, albeit at a reduced workload usually. Section 1–403(c) of the Courts and Judicial Proceedings Article does not contain such a specific authorization.

We find it instructive that, before the federal statute contained the language permitting senior judges to sit in banc, the U.S. Supreme Court construed the statute to forbid the participation of senior judges in banc. *Am.-Foreign S.S. Corp.*, 363 U.S. at 689–90, 80 S.Ct. at 1339. Moreover, the legislative history of the federal statute governing in banc hearings emphasizes the controversial nature of the inclusion of senior judges in such proceedings. From the inception of the statute, the law permitted only active circuit judges to sit in banc. 62 Stat. 871 (1948) (codified as amended at 28 U.S.C. § 46(c) (2000)). An amendment was passed in 1963 permitting senior judges to sit in banc on cases for which they sat originally on a panel of the court. Pub.L. No. 88–176, § 1(b), 77 Stat. 331. In 1978, however, Congress again amended the statute to remove the authorization granted 15 years prior for senior judges to participate in matters heard in banc when the judge participated in the case as part of a panel of the court. Pub.L. No. 95–486, § 5(a), 92 Stat. 1633. Four years later, Congress restored the ability of senior judges to sit in banc. Pub.L. No. 97–164, tit. II, § 205, 96 Stat. 53. This mercurial history relating to the propriety of allowing the participation of senior judges in cases heard in banc highlights the wisdom expressed by the U.S. Supreme Court in *Am.-Foreign S.S. Corp.*, *i.e.*, leave such determinations to the legislature to resolve. 363 U.S. at 690–91, 80 S.Ct. at 1339–40.

In the absence of a clear direction to the contrary from the General Assembly, we conclude that the language of Cts. & Jud. Proc. § 1–403(c) prohibits specially assigned judges from participating in the decision to order that a case be heard in banc, as well as from the actual hearing and decision of a case considered in banc. Accordingly, as retired Judges Moylan and Thieme were assigned specially to the instant case and participated in the decision in banc, we must vacate the

judgment of the Court of Special Appeals as having been issued by an improperly constituted in banc court. *See Washabaugh v. Washabaugh,* 285 Md. 393, 412 n. 15, 404 A.2d 1027, 1037–38 n. 15 (1979). This result speaks nothing of the merits of the other issue relating to the Department's finding of indicated child abuse. We remand the case to our appellate colleagues for further proceedings not inconsistent with this opinion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT TO BE DIVIDED EQUALLY BY THE PARTIES.